NOTICE
Decision filed 04/16/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 150439

NO. 5-15-0439

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 14-CF-223 |
| | ) | |
| JAROD C. REBER, | ) | Honorable |
| | ) | Bradley T. Paisley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Presiding Justice Overstreet and Justice Cates concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Jarod C. Reber, was found guilty of three counts of child pornography and one count of predatory criminal sexual assault of a child. The court sentenced defendant to consecutive sentences totaling 70 years in prison. The primary victim was the 12-year-old sister of defendant's wife.

¶ 2    Defendant timely filed this direct appeal on October 20, 2015. This court has jurisdiction pursuant to Illinois Supreme Court Rules 603 and 606, as well as article VI, section 6, of the Illinois Constitution. Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013); Ill. Const. 1970, art. VI, § 6.

¶ 3                              BACKGROUND

¶ 4    On December 11, 2013, the State charged defendant with the following two charges: one count of child pornography in violation of section 11-20.1(a)(1)(vii) of the Criminal Code of

1

2012 (Code) (720 ILCS 5/11-20.1(a)(1)(vii) (West 2012)) (Class X felony for allegedly videotaping a child under 18 while the child was unclothed, showing her exposed genitals and breasts on or about June 12, 2013, in Taylorville, Illinois (count I)) and one count of child pornography in violation of section 11-20.1(a)(1)(vii) of the Code (*id.*) (Class 1 felony for allegedly photographing a child under 18 in which her unclothed pubic area was exposed (count II)). On January 13, 2015, the State charged defendant with a third charge: one count of predatory criminal sexual assault of a child in violation of section 11-1.40(a)(1) of the Code (*id.* § 11-1.40(a)(1)) (Class X felony for digitally penetrating the vagina of a child under the age of 13 between May 1, 2013, and September 30, 2013, in Taylorville, Illinois (count III)). On June 16, 2015, the State charged defendant with one count of child pornography in violation of section 11-20.1(a)(6) of the Code (*id.* § 11-20.1(a)(6)) (Class 3 felony for possession of a photograph of a child that defendant should have reasonably known to have been under 18 engaged in an act of sexual conduct (count IV)).[1]

¶ 5                          Hearing on Intent to Offer Evidence of Other Crimes

¶ 6      Prior to trial, the State filed its notice of intent to offer evidence of other crimes. The trial court held its hearing on the State's notice on June 18, 2015. The trial judge thoroughly outlined the requirements of the applicable procedural statute at the beginning of the hearing. 725 ILCS 5/115-7.3 (West 2014). The State presented testimony and evidentiary documents to support its request that it be allowed to introduce the testimony of H.S., introduce multiple photographs and videos, and introduce the testimony of Caleb Reber, whose daughter is depicted in some of the photographs.

---

[1]Count I was amended to change the date to a range of between May 1, 2013, to September 30, 2013. Count II was amended to add a date range from January 1, 2012, to September 1, 2013. Count III was amended to change the date range to January 1, 2012, to September 30, 2013. Count IV was amended to add a date of the offense, December 19, 2014.

2

¶ 7    H.S. was the first to testify. She stated that she was currently 28 years old. She alleged that defendant began sexually abusing her in 1988 when she was 11 or 12 years of age. She met defendant when she was 10 and he was 17. Her involvement with defendant lasted until she was 13. Defendant began spending nights at H.S.'s home and eventually moved in with her family. Defendant followed H.S. and her family to Michigan after they moved there. The first sexual encounter occurred in Illinois while they were sitting on a couch watching a movie. She kept falling asleep and felt something pushing against her. Defendant then announced to her, "We did it." After that initial encounter, she began having sexual intercourse with defendant several times each week. She denied initiating contact but testified that she did not resist. She described the situation as confusing both because of her age and defendant's claim that he loved her. She never told her mother or friends and never reported what defendant did to the police. H.S. claims that her brother was aware of the abuse. She told her mother about the abuse in recent years. H.S. testified that she suffered from physical symptoms resulting from the sexual abuse.

¶ 8    Detective Daniel Marron, employed by the Christian County Sheriff's Department, next testified. He explained that the case began when his department was contacted by defendant's employer about pornographic images found on the laptop that had been assigned to defendant. Detective Marron contacted the Illinois Attorney General's Office for investigative assistance. The laptop was turned over to the attorney general's office, and they found numerous potentially pornographic images of underage girls. Detective Marron obtained a search warrant for defendant's home. He participated in defendant's interview, after which defendant gave the sheriff's department authorization to search his cellular phone. Additional images were located on the phone. Many images were of the two suspected victims, while other images included what

3

appeared to be underage girls with older men, as well as women purportedly engaged in sexual activities with animals.

¶ 9    Caleb Reber testified that the defendant is his brother. He testified that his nine-year-old daughter spent nights at defendant's house (between 20-30 times) when she was four or five years of age. Reviewing some of the photographs, Caleb identified his brother's couch and hand, as well as his daughter's Hello Kitty underwear and body. He provided the pair of underwear depicted in the photographs to the sheriff's department.

¶ 10    C.L., the victim of three of the charged crimes, testified. She was 14 years old on the date of the hearing. Her older sister, Breanne, is defendant's wife. C.L. began spending the night at defendant's house when she was 11 or 12. She stopped sleeping over when she turned 13 as she began spending more time with her friends. When C.L. spent the night at defendant's house, she always slept on the couch. She and defendant would watch movies and play PlayStation. C.L. identified herself in numerous photographs. She explained her self-identification as being based on her recognition of various articles of clothing shown in the photographs: her underwear with a heart-shaped design, her orange shorts, her black shorts with white line detail, the shorts with stars on them, and her black Danskin-brand shorts. She also identified the mole on the inner part of her right thigh. She testified that she used to suffer headaches when she woke up on Sunday at defendant's house, and that after she stopped sleeping over, the headaches ceased. C.L. also testified that defendant frequently would not let her use his bathroom until he went in first. Then after she exited the bathroom, he would go back into the bathroom.

¶ 11    The trial court compared the videos and photographs that were the foundation for the four charges against defendant with the photographs the State sought to introduce as evidence of other acts and/or crimes. The court explained that the goal was to ensure that defendant received a fair

trial and that the court was responsible to prevent the hearing from becoming a mini-trial. The court noted that this was necessary to minimize against any danger that the defendant could be convicted because of other acts or other crimes evidence rather than because of the actual charged events.

¶ 12    After announcing the law to be followed, the trial court concluded that the testimony of H.S. would be allowed but only as to the first sexual contact. Although many years had passed, the court noted that there was no bright-line rule on how many years were proper between the charged events and the offered other acts and/or crimes evidence. The court commented that although H.S. did not testify about digital penetration, other factors were similar: the victims were roughly the same age and female, the sexual abuse occurred late at night when the victims were alone with the defendant, and the victims were either living with or had a significant family relationship to the defendant. The court concluded that it did not find that the probative value of H.S.'s proposed testimony was outweighed by prejudice to defendant.

¶ 13    The majority of the photographs depicted one of the two suspected victims, and thus the trial court found no concern with proximity in time issue. The victim-based photographs were allowed. Some of the photographs offered by the State were of other males with possible underage girls. The trial court allowed the usage of some of those photographs and disallowed all photographs that depicted sexual acts other than digital penetration. The court also disallowed all bestiality photographs because those photographs were inconsistent with section 115-7.3 of the Code of Criminal Procedure of 1963 in that the other acts or crimes evidence must be of "evidence of the defendant's commission of another offense" as that with which he was charged. *Id.* § 115-7.3(b).

5

¶ 14                                     Bench Trial

¶ 15     The bench trial was held on June 24 and June 25, 2015. Several witnesses testified. The audiotape of defendant's interview was brought into evidence. The approved other acts and/or crimes photographic evidence was received into evidence. Defendant did not testify.

¶ 16                                   *Bryan Booth*

¶ 17     Bryan Booth is employed at Bob Ridings, an automobile dealership, in its Pana store as its business manager and finance director. Defendant worked in the Pana store from June 29, 2013, to October 31, 2013, as a salesperson. He was issued a laptop for work. Booth testified that he saw defendant's personal cellular phone plugged into the laptop on multiple occasions. After October 31, 2013, defendant was moved to the Decatur store and the laptop was locked in a safe. Booth acknowledged that other employees could have used the laptop during the months it was assigned to defendant.

¶ 18     In preparation for the laptop's use by a service manager, Booth retrieved it from the safe and began deleting unnecessary programs and anything of a personal nature. By mistake, Booth deleted a program. To retrieve the deleted program, he opened up the laptop's "trash can," and in doing so, Booth noticed a lot of pornographic photographs depicting what he believed to be underage girls. He called the owner of the car dealership, and the owner contacted the Christian County Sheriff's Department. Booth turned the laptop over to Detective Marron of the sheriff's department.

¶ 19                            *Detective Daniel Marron*

¶ 20     Detective Marron testified that after receiving a call from defendant's former employer, Booth turned the laptop over to the sheriff's department. Detective Marron then took the laptop

to the Illinois Attorney General's Office in Springfield. The attorney general's office was able to download multiple photographs and two videos.

¶ 21    Some of the photographs showed a young female. Detective Marron took one of the photographs to area schools and ultimately identified the older of the two suspected victims. From that information, he determined that defendant's wife was the victim's older sister.

¶ 22    Detective Marron went to the Christian County State's Attorney to seek a search warrant for defendant's home. Defendant was asked to meet with Detective Marron. He informed defendant that he was conducting a criminal investigation.

¶ 23    C.L.'s mother was contacted and interviewed. Defendant's wife was contacted and she reviewed one of the videos—the "bathroom video." Defendant's brother, Caleb Reber, spoke with Detective Marron and then brought his daughter's Hello Kitty underwear, depicted in some of the photographs, to the sheriff's department. The Department of Children and Family Services (DCFS) brought a pair of underwear to the sheriff's department that was provided by C.L.'s mother. The underwear was decorated with heart shapes. Caleb Reber's girlfriend brought in a wedding band that belonged to defendant, and Detective Marron testified that the wedding ring matched the ring worn by the man in the two videos. He was present for C.L.'s interview with DCFS. He also ordered a physical examination of C.L. by a local physician.

¶ 24    Detective Marron interviewed defendant, and the interview was audiotaped. During the interview, defendant acknowledged involvement with the photographs and videos found on his former work laptop and gave consent to have his cellular phone searched. The subsequent analysis of defendant's cellular phone revealed another graphic photograph depicting a small nude child and an adult male.

7

¶ 25    Later in the investigation, Detective Marron was contacted by H.S., who informed him about her "relationship" with defendant.

¶ 26    Detective Marron was recalled to testify in the defendant's case about various taped phone calls between defendant and his wife. During some of the calls, defendant proclaimed his innocence. On cross-examination, Detective Marron noted one call during which defendant said that he "did it" and that he wanted a chance to fix it.

¶ 27                    *Defendant's Audiotaped Interview*

¶ 28    Defendant was interviewed on December 10, 2014, by Detective Marron and Investigator Tom Berola of the Illinois Attorney General's Office. Defendant waived his *Miranda* rights.

¶ 29    Defendant denied that he transferred files from his cellular phone to a work laptop. The officers explained that deleted files were found on the laptop containing concerning photographs and videos. At first defendant did not want to discuss the videos because he stated that the issue was "quite embarrassing." He first said that he took photographs of his wife while sleeping. When confronted with the fact that there were two younger-looking girls in these photographs, defendant stated that "it was kind of a situational thing" and that he had been in a "wrong state of mind."

¶ 30    Defendant admitted that his wife's sister had slept over at the house. He said that the photographs of his wife's sister were taken when she was 13 years old. His wife was in the bedroom. His wife's sister was sleeping on the couch and did not wake when he pulled her underwear aside and took the photographs. He denied that he had attempted to insert a finger into her vagina but acknowledged that he could have brushed up against her private areas in attempting to pull her underwear to the side. At first defendant stated that this only happened one

8

night, but then was forced to acknowledge that it occurred more than once because his wife's sister was wearing multiple pairs of shorts.

¶ 31    Defendant did not admit knowledge of the little girl who was wearing Hello Kitty underwear in some of the photographs.

¶ 32    About other pornographic photographs, defendant denied trading photographs with anyone else but stated that he would visit various sites, including a nudist site, and would download photographs from those sites.

¶ 33    Defendant stated that he had no idea why he committed these acts with his wife's sister. He stated that she was like his own child until approximately two years before the interview. He said that he was not attracted to her but felt compelled to do this to her.

¶ 34    Defendant acknowledged creating the bathroom video and told the officers that he knew that his wife's sister was going to be changing clothing in his bathroom. He filmed her changing clothing with a Canon digital camera he hid next to the toilet.

¶ 35    The officers repeatedly asked defendant if he had anything else to tell them. In response, defendant said that he knew this would happen. He said that he liked looking at all nude women's bodies including that of "pubescent" teenage girls. He told the officers that he especially liked to look at the nudist sites because of the family dynamic with parents and their young children. He told the officers that his interest was not sexual but was just something that he enjoyed.

¶ 36                    *Christian County Investigator Jeffrey Brown*

¶ 37    Investigator Brown testified that he executed the search warrant at defendant's house on December 10, 2014. He took photographs of the inside of the house, as well as any articles collected. The items collected included a pair of defendant's Nike shoes and the shower curtain

seen in the bathroom video. In addition, Investigator Brown seized a Motorola cellular phone, a Canon digital camera, and a Sony camcorder. Investigator Brown also testified that he came in contact with defendant's work laptop and his Samsung cellular phone. Finally, he also brought two pairs of underwear and a wedding ring to court that had been stored in the evidence locker at the sheriff's department.

¶ 38                     *Illinois Attorney General Investigators*

¶ 39    Investigator Siobhan McCarthy, a computer evidence recovery technician with the Illinois Attorney General's Office, was certified as an expert in computer evidence data recovery. Investigator McCarthy testified about the process she used to extract photographs and videos from defendant's work laptop. She testified that defendant downloaded the photographs to the laptop on September 29, 2013.

¶ 40    Investigator Berola testified that he had completed hundreds of cellular phone examinations during his career with the attorney general's office. He was certified as an expert in the field of cellular phone examination and data extraction. Investigator Berola testified about the process he used to extract photographs and videos from defendant's Samsung cellular phone.

¶ 41                     *Caleb Reber*

¶ 42    Caleb testified that defendant is his brother. Caleb has two children, one of whom is a nine-year-old girl. He allowed his daughter to spend the night at his brother's house on numerous occasions. Caleb was contacted by law enforcement to look at photographs that were found on his brother's laptop. He was shown one of the photographs and he testified that his daughter was the child depicted. He testified that he recognized defendant's couch and hand as well as his daughter's body and underwear. His daughter would have been five, six, and seven years of age during the relevant months at issue—January 2012 through September 2013. Caleb also

10

identified a photograph of his brother's wedding ring and testified that he had obtained the ring from defendant' wife. He testified that he knew H.S. in that defendant was close friends with H.S.'s older brother. He testified that when H.S. was 10-11 years of age, he saw her with defendant at H.S.'s house. At that time, his brother was somewhere between 17 and 19 years old. When H.S. and his brother were together, they were always lying together on the couch.

¶ 43                                          *Alicia Smith*

¶ 44     Alicia Smith is Caleb Reber's girlfriend and the mother of one of the suspected victims. She testified that Caleb gave her defendant's wedding ring, and she delivered it to the sheriff's department.

¶ 45                                          *Penny L.*

¶ 46     Penny L. is the mother of defendant's wife, Breanne, and C.L. She testified that Breanne began dating defendant when she was 16 and he was 21 or 22 years old. The sheriff's department called Penny and asked her to watch the bathroom video. Penny testified that the bathroom video showed her daughter, C.L. She also looked at the other photographs that had been downloaded from defendant's laptop and recognized C.L. in many of the photographs. Her identification of C.L. was based on her recognition of C.L.'s underwear and the shape of her legs and body. She then went home and found the underwear and brought them to the DCFS worker assigned to the case.

¶ 47     Penny was recalled to testify in the defendant's case primarily about statements her daughter, Breanne L. (defendant's wife), made to her about the photographs and videos. Penny testified that Breanne told her that some of the photographs were of her—not C.L. Penny acknowledged that she was not happy with Breanne, who initially did not believe that her husband engaged in the accused acts. She encouraged Breanne to look at all of the photographs

11

and both videos. When Breanne had thought that she was the person in the video, the only video she had seen was the digital penetration video. Penny admitted that before this case she had advised Breanne that she should divorce the defendant but denied telling her to do so after defendant was charged.

¶ 48 Penny also testified that she was present when C.L. had her examination with Dr. Jennifer DeLuka. She identified a document Dr. DeLuka created that was a diagram noting where C.L.'s mole was located.

¶ 49 Penny testified that she had attempted to avoid discussing the case with C.L., but if C.L. asked her a question about the case, she would answer the question. Part of the reason Penny chose not to discuss the case with C.L. was because just six months prior to the charges, C.L.'s father was diagnosed with cancer and passed away. Penny stated that C.L. truly had not mourned the death of her father and had become quiet and reserved. Penny testified that she asked the state's attorney to seek a fair punishment. She defined the term "fair punishment" as a sentence lasting until C.L. and defendant's son were legally adults.

¶ 50                                    *Breanne L.*

¶ 51 Breanne testified that she was no longer married to the defendant. She identified defendant's wedding ring. She confirmed that her sister, C.L., used to spend the night at her home. C.L. would sleep on the couch. One time she found the defendant sleeping behind C.L. on the couch. She confirmed that the underwear with hearts on it did not belong to her. She identified a photograph of her sister, C.L., and of her bathroom. When she went to the sheriff's department for questioning, they showed her the bathroom video, and she identified her sister, who was changing clothing. She also testified that the defendant was the person starting and stopping the camera because she recognized his shoes. She denied that she was depicted in any

12

of the photographs introduced into evidence. The sheriff's department also had her watch the video in which C.L. was being digitally penetrated by defendant. She recognized her sister's mole, defendant's hands, and her couch and blanket. On cross-examination, Breanne acknowledged that initially she had told people that she could have been the person depicted in the video of digital penetration.

¶ 52   Breanne was recalled to testify in the defendant's case mainly about her interactions with her mother. She testified that her mother encouraged her to seek a divorce. The divorce is final, and Breanne was awarded custody of their child subject to defendant's visitation rights. On cross-examination, Breanne testified that defendant asked her not to go through with the divorce because it could hurt his criminal case.

¶ 53                                                        *C.L.*

¶ 54   C.L.'s testimony mostly mirrored her testimony at the hearing on the other acts or crimes evidence. She went through all of the photographs and the videos at trial and identified herself in all of them. She identified the clothing that she was wearing, the mole on the back of her right thigh, and her hair. C.L. was able to determine that the bathroom video occurred in the summer of 2012. She recognized the swimsuit that she was wearing in the video. C.L. concluded that some of the photographs of her were taken in December 2012 or early 2013 based upon the position of the furniture in the living room. C.L. testified that when she was interviewed by a DCFS worker, she told the worker that she did not know why she was being interviewed. After the DCFS interview, C.L.'s mother told her about the allegations against defendant, and that there were photographs and videos of her. Her mother did not tell her what allegedly happened when the photographs and videos were taken. C.L. stated that she almost always had a headache

the next day after she spent the night at defendant's house. After she stopped spending nights at defendant's house, her headaches decreased but did not completely go away.

¶ 55                                    *Jamie Bramblett*

¶ 56    Jamie Bramblett testified that she was the DCFS worker who ordered C.L.'s physical examination. She interviewed Breanne twice and Penny six times. She testified that Breanne told her that she was the female in some of the photographs. Bramblett testified that she told Penny that defendant was being charged with penetration based upon the discovery of a video.

¶ 57                                    Convictions

¶ 58    At the conclusion of the trial, the court determined that the State had established defendant's guilt beyond a reasonable doubt on all four charges.

¶ 59    Count I was the child pornography charge based upon the bathroom video. The court noted that there was no question that defendant set up the camera and intended to obtain video of C.L. At issue was whether the images in the video were lewd. The trial court considered the six factors set forth by the supreme court in *People v. Lamborn*, 185 Ill. 2d 585, 592, 708 N.E.2d 350, 354 (1999) ((1) if the focal point of the image is the child's genitals, (2) if the setting or pose is sexually suggestive, (3) if the child is depicted in an unnatural pose or in inappropriate clothing, (4) if the child is clothed or nude, (5) if the child is depicted to suggest a coyness or willingness to engage in sexual activity, and (6) if the child is depicted with the intent to elicit a sexual response in the viewer). The court concluded that the camera was set up in order to possibly capture an image of C.L.'s genitals, that C.L. was fully nude, and that the video placed the viewer in the role of a voyeur or "Peeping Tom." Those three factors supported the trial court's conclusion that defendant was guilty of this charge.

¶ 60    Count II was a child pornography charge based upon one photograph of a hand touching a pubic region of a female. C.L. identified herself as the female. Defendant admitted during jailhouse phone calls that he took the photographs. Furthermore, the court concluded that he took the photographs because they were found on his laptop. Using the *Lamborn* factors, the trial court found that the image was lewd because the focus of the photograph was on the child's genitals, the visual depiction was sexually suggestive, the child was partially nude, the pose was unnatural in that a 12-year-old would not be lying face down on a couch in the middle of the night with her genitals exposed and a man touching the genitals, and the visual depiction was intended to elicit a sexual response. The court found that the factors clearly supported its conclusion that defendant was guilty of this charge.

¶ 61    Count III was a predatory criminal sexual assault charge based upon the video showing a man digitally penetrating a female's genitals. The court found that defendant was the man in the video. The court found that the video showed a slight intrusion into C.L.'s vagina, and thus the penetration element was satisfied. Accordingly, the court concluded that defendant was guilty of this charge.

¶ 62    Count IV was a child pornography possession charge based upon one photograph extracted from defendant's cellular phone that depicted a nude female infant lying on the floor with a male's erect penis placed on the infant's leg. The court found that the photograph was clearly lewd and concluded that defendant was guilty of the charge.

¶ 63                                    Sentencing

¶ 64    Defendant was sentenced on August 10, 2015.

¶ 65    At the hearing, the State offered a taped phone conversation between defendant and his father during which defendant was asked about the photographs of his brother Caleb's daughter.

Defendant told his father that he lacked information about those photographs, that he had been drunk, and that when he woke up the next day the photographs were on his phone. The State also called H.S., who testified consistent with her testimony at the other acts and/or crimes evidence hearing. She testified that she sent defendant a confrontational Facebook message on September 24, 2013, before he was charged. She wrote the message to defendant to let him know about the lasting mental and physical effects caused by his years of sexual abuse.

¶ 66    Nick Reber, then 17 years old, testified for his father. Defendant sought and was awarded custody of Nick. Nick testified that his father was caring and loving. He helped Nick with improving his athletic skills, with homework, and in playing video games.

¶ 67    Defendant provided his own statement of allocution in which he apologized to all affected by his actions. He stated that he had no ability to explain why these actions occurred, but that he hoped with treatment he would get better. He informed the court that he took full responsibility for his actions and that he knew he must be punished but asked for leniency in order for him to continue to have an opportunity to be an involved father with his three sons.

¶ 68    The trial court noted that it considered the victim impact statement, the trial evidence, the presentence investigation report, the sex offender report, the evidence and arguments presented during the sentencing hearing, defendant's statement of allocution, and all statutory factors in aggravation and mitigation. In mitigation, the court noted that defendant's incarceration would present a hardship to his family and that, in committing the crimes of which he was convicted, he did not physically harm or threaten to harm his victims. In aggravation, the court found that there was a threat of serious harm to his victim. The trial judge stated:

   "It has been my experience that children who were involved in this type of unfortunate
   situation are very much more prone to suffer all kinds of things in the future, uh, from

16

becoming a perpetrator themselves to having difficulty in developing and keeping normal relationships. Uh, alcohol and drug abuse is higher amongst kids that are involved and victimized in that way. There is just a lot of that that we don't know. And hopefully, her family will be able to help her and get her into counseling to minimize that threat of harm, but that threat is certainly there."

The court noted that defendant had two older felony convictions, but stated that those were not a large aggravating factor. Also in aggravation, the court found that defendant held a position of trust and supervision to the victim as her brother-in-law. The court found that deterring others was a relevant aggravating factor, and stated that defendant's behavior was "disgusting," would have long-lasting repercussions, and could not be tolerated in a civil society. The court found that defendant did not exhibit genuine remorse for what he did. In conclusion, the court found that defendant was a medium to high threat to recidivate and was a threat to society.

¶ 69    On count I (the bathroom video child pornography charge), the trial court sentenced defendant to 20 years followed by 3 years to life of mandatory supervised release (MSR). On Count II (photograph of victim child pornography charge), the trial court sentenced defendant to 10 years followed by 3 years to life of MSR. On count III, predatory criminal sexual assault, the trial court sentenced defendant to 35 years followed by 3 years to life of MSR. On count IV (photograph of unknown child—child pornography charge), the trial court sentenced defendant to five years, followed by one year of MSR. The court ordered defendant to serve the four sentences consecutively.

¶ 70    Defendant's timely motion to reconsider the sentence was denied on September 29, 2015.

¶ 71                                    LAW AND ANALYSIS

¶ 72                              Other Acts and/or Crimes Evidence

¶ 73    Defendant first argues that the trial court did not properly evaluate the other acts and/or crimes evidence in concluding that the probative value of this evidence outweighed the prejudice to the defendant. We disagree.

¶ 74    Evidence of other acts and/or crimes evidence is not generally admissible to prove that the defendant has a propensity to commit a crime. See *People v. Richee*, 355 Ill. App. 3d 43, 50-55, 58-59, 823 N.E.2d 142, 149-53, 155-56 (2005); but see *People v. Boyd*, 366 Ill. App. 3d 84, 91-92, 851 N.E.2d 827, 835-36 (2006) (holding that admission of sexual assault of another victim was proper other crimes evidence to prove the defendant's intent and propensity to commit rape).

¶ 75    Despite the general rule that other acts and/or crimes are inadmissible to establish intent or propensity, certain sexually-based acts and/or crimes may be admissible to establish a defendant's intent or propensity to commit a similar crime. Section 115-7.3 of the Code of Criminal Procedure of 1963 authorizes the introduction of other acts and/or crimes evidence in specific cases and provides specific guidance for admissibility. 725 ILCS 5/115-7.3 (West 2014). "This legislation, which is unique to sex offenders, recognizes the propensity of sex offenders to repeat their crimes, and it allows the court to use this evidence in order to help protect society." 90th Ill. Gen. Assem., Senate Proceedings, Mar. 19, 1997, at 56-57 (statements of Senator Radogno). The legislature elected to single out sex offenders by allowing the introduction of evidence of other acts and/or crimes because sex offenders tend to repeat their crimes. *People v. Childress*, 338 Ill. App. 3d 540, 549-50, 789 N.E.2d 330, 337-38 (2003).

¶ 76 Looking at the crimes that defendant was accused of committing, we note that both child pornography and predatory criminal sexual assault of a child are listed in section 115-7.3 as the types of crimes where other acts and/or crimes evidence could be admissible. 725 ILCS 5/115-7.3(a)(1) (West 2014). "If the defendant is accused of an offense *** [in this statute] ***, evidence of the defendant's commission of another offense or offenses *** [in this statute] *** may be admissible *** and may be considered for its bearing on any matter to which it is relevant." *Id.* § 115-7.3(b). Proof of other acts and/or crimes evidence may be made "by specific instances of conduct." *Id.* § 115-7.3(e).

¶ 77 Admission of these specific other acts and/or crimes is not without limits. The trial court must not allow evidence of other acts and/or crimes unless after weighing the probative value of the evidence, the court concludes that the probative value outweighs any undue prejudice to the defendant. *Id.* § 115-7.3(c). Section 115-7.3(c) provides three factors that the court may consider in making this determination: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." *Id.*

¶ 78 On appeal, the reviewing court may reverse the trial court's decision to admit other acts and/or crimes evidence, if it finds that the trial court abused its discretion. *People v. Donoho*, 204 Ill. 2d 159, 182, 788 N.E.2d 707, 721 (2003). Trial courts have been urged "to be cautious in considering the admissibility of other-crimes evidence to show propensity." *Id.* at 186. The meaningful assessment required by the trial court generally requires the trial court to discuss both the probative and undue prejudicial value of the evidence and then to weigh these two values. *People v. Johnson*, 406 Ill. App. 3d 805, 812, 941 N.E.2d 242, 250-51 (2010); *Boyd*, 366 Ill. App. 3d at 94.

19

¶ 79　Finally, we note that admission of other acts and/or crimes evidence is not compulsory even if the requirements of section 115-7.3 are met. *People v. Cardamone*, 381 Ill. App. 3d 462, 489, 885 N.E.2d 1159, 1180 (2008). "Courts generally prohibit the admission of this evidence to protect against the jury convicting a defendant because he or she is a bad person deserving punishment." *Donoho*, 204 Ill. 2d at 170 (citing *People v. Manning*, 182 Ill. 2d 193, 213-14, 695 N.E.2d 423, 432 (1998)). The evidence of other crimes is not construed as irrelevant, but instead is overly probative. *Id.* (citing *Manning*, 182 Ill. 2d at 213). The primary focus of the criminal trial must be that the defendant has "his guilt or innocence evaluated solely on the basis of the charged crime." *Id.* (citing *People v. Lampkin*, 98 Ill. 2d 418, 430, 457 N.E.2d 50, 56 (1983)). In other words, the trial judge should not allow a "mini-trial" of the other uncharged offense "but should allow only that which is necessary to 'illuminate the issue for which the other crime was introduced.' " *People v. Bedoya*, 325 Ill. App. 3d 926, 938, 758 N.E.2d 366, 377 (2001) (quoting *People v. Nunley*, 271 Ill. App. 3d 427, 432, 648 N.E.2d 1015, 1018 (1995)).

¶ 80　Initially, we note that defendant did not preserve this issue for appeal, as he did not specifically object during the hearing and did not raise the issue in his posttrial motion. Therefore, the defendant forfeited the issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30 (1988).

¶ 81　Defendant asks this court to consider the issue as plain error. The plain error doctrine can be used in criminal cases to review unpreserved error in two situations: "if either [(1)] the evidence was closely balanced or [(2)] the error was of such magnitude that the defendant was denied a fair trial." *People v. Hindson*, 301 Ill. App. 3d 466, 473-74, 703 N.E.2d 956, 962-63 (1998) (citing *People v. Petitt*, 245 Ill. App. 3d 132, 139, 613 N.E.2d 1358, 1365 (1993)); *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010) (citing *People v. Piatkowski*, 225

20

Ill. 2d 551, 565, 870 N.E.2d 403, 410 (2007)). The defendant bears the burden of persuasion in plain error review. *Thompson*, 238 Ill. 2d at 613 (citing *People v. McLaurin*, 235 Ill. 2d 478, 495, 922 N.E.2d 344, 355 (2009)).

¶ 82 Alternatively, defendant asks this court to find that he had ineffective assistance of trial counsel because his attorney did not raise this issue in a posttrial motion. To prevail on an ineffective-assistance-of-counsel claim, defendant must show that his attorney's representation was objectively unreasonable and that he was prejudiced by that representation. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This standard requires a finding that it is reasonably probable that the defendant would not have been convicted if his attorney had not committed error. *Id.*

¶ 83 Defendant first argues that the trial court erred by admitting other pornographic photographs of the victims, C.L. and Caleb Reber's daughter, that were not connected to the criminal charges filed against him. Here, the trial court found that the photographs at issue were contemporaneous to, as well as similar to, the charged conduct. "Evidence of another crime *** may be used only when the other crime has some threshold similarity to the crime charged. It is this similarity which increases the relevance of the evidence ***." *People v. Bartall*, 98 Ill. 2d 294, 310, 456 N.E.2d 59, 67 (1983). As the factual similarities increase between the crime charged and the other crimes evidence proposed, the relevance or probative value also increases. *Id.* Defendant does not contest these findings. Instead, he argues that while the trial court found that the photographs at issue were probative, the court did not determine that the probative value outweighed the prejudicial effect resulting from introduction of the extra photographs.

¶ 84 Here, the State asked the trial court to introduce numerous photographs—of the victims specifically and of pornographic images of unknown persons generally. Having reviewed the

21

transcript of the hearing, we find that despite defendant's arguments, the trial court very carefully considered each photograph proposed by the State. With respect to the pornographic photographs of other persons, the trial court limited those photographs to those depicting the identical sexual act the defendant was charged with committing—digital penetration of the victim's vagina. All photographs involving any other sexual act were excluded as being not relevant and potentially prejudicial. The photographs of the two victims were allowed because they portrayed both the steps in the process of digital penetration as well as the reoccurrence of the acts between defendant and C.L. The photographs depicted C.L. in several different pairs of shorts with her underwear pulled aside by defendant's hand and fingers. The photographs of the daughter of defendant's brother were similar in subject matter. The trial court understood that the balancing test was required for admission, having stated the legal requirements on the record at the beginning of the hearing. The court went through the test with all photographs not depicting the two victims. However, when ruling on the photographs of the two victims, the court stated that the photographs were contemporaneous in time and similar to the charged conduct and thus should be admitted. The balancing test was not mentioned. The ruling would have been more clear and certain if the court would have stated that the probative effect of the photographic evidence outweighed the prejudice to the defendant. We find that the court should have specifically made that supportive statement.

¶ 85    Even if we presume that the trial court's overall balancing test consideration was incomplete and potentially erroneous, courts have concluded that this type of error could be harmless. See *Johnson*, 406 Ill. App. 3d at 812 (holding that admission of an uncharged sexual assault was inadmissible but harmless because of the strength of the State's case on the charged crime). Furthermore, a trial judge is presumed to know the law, and on review, the appellate

22

court presumes that the trial judge followed applicable law unless the record indicates otherwise. *People v. Groel*, 2012 IL App (3d) 090595, ¶ 43, 970 N.E.2d 1259. On the basis of the trial court's careful concern for and consideration of all statutory requirements for admission of the photographs, including the balancing test, we find the court's omission of the balancing test in its stated ruling on these photographs was harmless error.

¶ 86    We do not find that the "error" was of such magnitude that the defendant was denied a fair trial. *Hindson*, 301 Ill. App. 3d at 473-74. Defendant elected to waive his right to a jury trial. In light of that decision, we presume that the trial judge applied the proper standards in consideration of the photographic evidence. *Groel*, 2012 IL App (3d) 090595, ¶ 42. Furthermore, the evidence in this case was strong. All of the videos and photographs were discovered on defendant's work laptop. Defendant admitted to these sexual actions during his police interview. The victim, C.L., was able to identify her clothing and her body from the videos and the one photograph. Other witnesses identified defendant's bathroom as the scene of one of the videos of C.L., and defendant's hand and wedding ring in another photograph. While defendant's attorney did not raise this issue in his posttrial motion, we also do not conclude that defendant was prejudiced by this failure. Based on the strength of the State's case, we do not find that there is a reasonable probability that without that "error," the outcome of the case would have been different. *Strickland*, 466 U.S. at 687.

¶ 87    Defendant alternatively alleges that the trial court conducted a mini-trial on the uncharged pornography, and thus he was denied a fair trial. For the same reasons stated in response to his argument that the trial court erred in admitting those photographs, we conclude that defendant's argument is meritless. Here, the trial court explained on the record its concern and understanding that a hearing on other acts and/or crimes evidence should not be a mini-trial.

23

As stated earlier in this opinion, a trial judge is presumed to know the law, and this court presumes that the trial judge followed all applicable law. *Groel*, 2012 IL App (3d) 090595, ¶ 43. From our review of the record, we find that the trial judge only allowed those photographs necessary to "illuminate the issue for which the other crime was introduced." *Nunley*, 271 Ill. App. 3d at 432.

¶ 88    We find that the other acts and/or crimes photographs introduced into evidence established a pattern of conduct relevant to the defendant's late night sexual interactions with young females while asleep on his sofa. Accordingly, the trial court's introduction of these other photographs was proper, and we affirm the convictions.

¶ 89                                    Sentencing

¶ 90    Defendant also argues that his due process rights were violated at sentencing and thus he was denied a fair sentencing hearing because the trial court considered evidence outside of the record—that in the trial judge's experience a young victim of criminal sexual assault would suffer psychological harm. There was no evidence presented at sentencing that C.L. was psychologically harmed by the assault. Defendant argues that his sentence should be vacated and that a new sentencing hearing be awarded. As with the first issue, defendant did not raise this issue in his posttrial motion, and therefore we could consider the matter as forfeited. *Enoch*, 122 Ill. 2d at 186. He again asks this court to consider the issue as plain error.

¶ 91    We find that defendant's argument fails in that the evidence in this case was not closely balanced as necessary for plain error review. See *Hindson*, 301 Ill. App. 3d at 473-74 (citing *Petitt*, 245 Ill. App. 3d at 139). In addition, the trial judge's consideration of possible future psychological harm to the victim was not erroneous.

¶ 92 We have already found that the State presented a strong case against the defendant. Defendant essentially admitted these acts during his interview. He expressed confusion about why he committed these actions against C.L., and referenced his compulsion in doing so. The trial court heard testimony about the pattern of allowing C.L. to spend the night. Defendant and C.L. would stay awake late at night watching movies or playing video games. Defendant's wife went to bed, leaving her sister and her husband alone in the living room. Defendant was identified in the videos and photograph involved in the criminal charges. C.L. identified herself in the videos and photograph. The videos and photographs were found on defendant's work laptop. In short, the evidence in this case was not "close."

¶ 93 The remaining alternative for plain error review would require a finding that the trial court committed a grave error that denied the defendant a fair trial. Here, the trial court discussed its knowledge that C.L. had not been aware that she was being sexually assaulted because she was asleep. However, subsequent to the discovery of the photographs and videos on defendant's work laptop, C.L. became aware of what defendant had done to her. The trial judge noted that although C.L. seemed fine, his experience with child victims of sexual assaults indicated that she could experience difficulties in the future. Accordingly, the trial judge considered possible future psychological harm as an aggravating factor in determining defendant's sentences.

¶ 94 Psychological trauma to a victim may be considered as an aggravating factor without direct evidence of trauma. *People v. Burton*, 102 Ill. App. 3d 148, 154, 429 N.E.2d 543, 547-48 (1981) (citing *People v. Lloyd*, 92 Ill. App. 3d 990, 416 N.E.2d 371 (1981)). In *People v. Burton*, the appellate court concluded that the trial court properly considered that the two victims were very small, frightened, insecure, and "damaged," and that the psychological trauma to the victims should be considered at sentencing. *Id.* at 153-54; see also *People v. Calva*, 256 Ill. App.

25

3d 865, 875, 628 N.E.2d 856, 864 (1993) (court may infer psychological trauma when the victim of a sexual assault is a juvenile); *People v. Huddleston*, 212 Ill. 2d 107, 135, 816 N.E.2d 322, 338 (2004) (stating that "aside from any *physical* injury a child may suffer \*\*\*, children who are sexually assaulted are subject to chronic *psychological* problems that may be even more pernicious" (emphases in original)).

¶ 95    A trial court's sentence is entitled to great deference and weight. *People v. Mischke*, 2018 IL App (2d) 160472, ¶ 14, 109 N.E.3d 366 (citing *People v. Latona*, 184 Ill. 2d 260, 272, 703 N.E.2d 901, 908 (1998)); *People v. Coleman*, 166 Ill. 2d 247, 258, 652 N.E.2d 322, 327 (1995). Where the sentence imposed by the trial court is within the applicable statutory range, the reviewing court should not disturb the sentence unless it concludes that the trial court abused its discretion. *Coleman*, 166 Ill. 2d at 258; *People v. Jones*, 168 Ill. 2d 367, 373-74, 659 N.E.2d 1306, 1308 (1995).

¶ 96    We have reviewed the sentencing hearing transcript and considered defendant's argument and conclude that the trial court's consideration of possible psychological damage to C.L. was appropriate. At the sentencing hearing, the court heard the testimony of H.S., who testified about the years of her sexual relationship with defendant beginning when she was 11 years of age. She testified, in part, to her own psychological damage resulting from this relationship. In light of this testimony, and the trial court's own experience, consideration of possible psychological harm to C.L. in the future was not erroneous.

¶ 97    We affirm the trial court's sentences and conclude that the sentences do not represent an abuse of the court's discretion.

¶ 98                                    CONCLUSION

¶ 99    For the reasons stated in this opinion, we affirm the defendant's convictions and

sentences.


¶ 100   Affirmed.

2019 IL App (5th) 150439

NO. 5-15-0439

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Christian County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-223 |
| JAROD C. REBER, | ) ) ) | Honorable Bradley T. Paisley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

| | |
|---|---|
| **Opinion Filed:** | April 16, 2019 |

_____

| | |
|---|---|
| **Justices:** | Honorable Melissa A. Chapman, J. |
| | Honorable David K. Overstreet, P.J., and Honorable Judy L. Cates, J. Concur |

_____

| | |
|---|---|
| **Attorneys for Appellant** | Michael J. Pelletier, State Appellate Defender, Jacqueline L. Bullard, Deputy Defender, Amanda S. Kimmel, Assistant Appellate Defender, Office of the State Appellate Defender, Fourth Judicial District, 400 West Monroe Street, Suite 303, P.O. Box 5240, Springfield, IL 62705-5240 |

_____

| | |
|---|---|
| **Attorneys for Appellee** | Hon. Michael M. Havera, State's Attorney, Christian County Courthouse, 101 South Main Street, Taylorville, IL 62568; Patrick Delfino, Director, Patrick D. Daly, Deputy Director, Kelly M. Stacey, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864 |

_____